# In the United States Court of Federal Claims

No. 24-775

(Filed: February 27, 2025)

* * * * * * * * * * * * * * * * * * * * * *

EDUCATION CREDITOR TRUST and
U.S. BANK TRUST COMPANY, *et al.*,

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant*.

* * * * * * * * * * * * * * * * * * * * * *

*James A. Newton*, New York, NY, for plaintiff, Education Creditor Trust.

*Lawrence S. Sher*, Washington, D.C., with whom were *T. Reed Stephens*, for plaintiff, U.S. Bank Trust Company, National Association. *Carey D. Schreiber*, of counsel.

*Margaret J. Jantzen*, Senior Trial Attorney, United States Department of Justice, Civil Division, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Steven J. Gillingham*, Assistant Director, for defendant.

## OPINION

BRUGGINK, *Senior Judge*.

On April 17, 2024, plaintiffs, Education Creditor Trust ("ECT") and U.S. Bank Trust Company, National Association ("U.S. Bank"), filed this action against the United States for breach of an express or implied contract and/or an unlawful taking of plaintiffs' property in violation of the Fifth Amendment to the United States Constitution. Plaintiffs allege that the United States Department of Education ("DOE") breached an agreement with a group of post-secondary educational institutions (collectively,

"EDMC") by drawing on a letter of credit for unauthorized purposes. The plaintiffs, lenders to EDMC under the relevant letter of credit, seek to recover up to $92 million in letter of credit proceeds they assert were improperly held or utilized by DOE. The complaint asserts three counts: breach of an express contract; breach of an implied-in-fact contract; and an unlawful Fifth Amendment taking. Pending is defendant's August 30, 2024 motion to dismiss under Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC") for failure to state a claim, or alternatively, under Rule 12(b)(1) for lack of subject matter jurisdiction. Defendant's position is that there is no privity of contract between it and the plaintiffs and that no compensable taking occurred because plaintiffs hold no property interest in the letter of credit proceeds.

Oral argument was held on January 28, 2025. Because plaintiffs plausibly allege that a binding contract arose between EDMC and DOE, encompassing both the PPAs and letter of credit terms, and because plaintiffs plausibly allege that EDMC's rights under that contract passed to them, we deny defendant's 12(b)(1) and 12(b)(6) motions to dismiss plaintiffs' counts 1 and 2 breach of contract claims. We grant, however, defendant's motion to dismiss plaintiffs' count 3 takings claim.

## BACKGROUND[1]

### I. EDMC's Participation in Title IV Funding Programs

For more than fifty years, EDMC operated for-profit post-secondary educational institutions across the United States. Pls.' Compl. ¶ 22. These institutions included Argosy University, the Art Institutes, Brown Mackie College, South University, and the Western State University College of Law. *Id.* A significant portion of EDMC's revenue was comprised of federal financial aid originating in Title IV of the Higher Education Act ("HEA"). *Id.* ¶ 23. Pursuant to the HEA,[2] federal funding to post-secondary institutions,

---

[1] The facts are drawn from the complaint and assumed to be true for purposes of ruling on the motion.

[2] To be an eligible institution to receive federal funds, the institution must "enter into a program participation agreement with the Secretary [of Education]." 20 U.S.C. § 1094(a) (2021). The PPA would "condition the

including EDMC, is governed by program participation agreements ("PPAs") between each educational institution and DOE. *Id.* ¶ 1. Defendant does not question that the PPAs are contractual instruments.

One of the HEA's and PPAs' conditions for participation in the funding program is financial responsibility. 20 U.S.C.A. § 1099c; Pls.' Compl. Ex. 1, at 2.[3] Because EDMC's institutions were not deemed financially responsible, the PPAs required each school annually to "post surety in the form of an irrevocable letter of credit" to the benefit of DOE in an amount equal to a percentage of funds received. Pls.' Compl. Ex. 1, at 3.[4] Per the PPA, the applicable letter of credit was required to "us[e] the format provided by the Secretary [of Education]." *Id.* If a school was found financially unstable and/or shut down operations, DOE could draw funds from the letter of credit, in whole or in part, to pay for liabilities associated with the schools. Pls.' Compl. ¶ 5. Each letter of credit was to be renewed yearly "not less than 10 days prior to its expiration date." *Id.* If any of EMC's institutions received federal funds without securing an appropriate letter of credit, they were subject to administrative action. *Id.* ¶ 24.

## II. The BNP Letter of Credit and EDMC Credit Agreement

The letter of credit in dispute here initially was issued with respect to EDMC's institutions on October 12, 2006, by BNP Paribas New York Branch ("BNP Paribas") in the amount of $87,900,000. *Id.* ¶ 1; Pls.' Compl.

---

initial and continuing eligibility of an institution to participate in a [student aid] program . . . ." *Id.*

[3] To participate in Title IV programs, "an institution must demonstrate to the Secretary [of Education] that it is financially responsible" under DOE's standards of financial responsibility. 34 C.F.R. § 668.171(a)–(b). According to the PPA for Brown Mackie College, which plaintiffs assert is representative of all of EDMC's other PPAs, "[t]he institution does not meet the standards of financial responsibility as set forth in 34 CFR § 668.171." Pls.' Compl. Ex. 1, at 3.

[4] Under § 668.171(g), "[t]he Secretary [of Education] may permit an institution that is not financially responsible . . . to participate in the title IV, HEA programs" if, among other things, "[t]he institution submits to the Secretary [of Education] an irrevocable letter of credit . . . that is not less than 10 percent of the title IV, HEA program funds received by the institution during its most recently completed fiscal year." 34 C.F.R. § 668.171(g)(iii).

Ex. 3, at 1. Consistent with DOE's requirements, the BNP Letter of Credit allowed DOE to make a protective draw on the letter of credit proceeds if EDMC's institutions failed to renew or replace the BNP Letter of Credit within 10 days of its expiration date. Pls.' Compl. Ex.3, at 2. The BNP Letter of Credit also specified three permissible uses for which DOE could spend withdrawn funds:

1) To pay refunds of institutional or non-institutional charges owed to or on behalf of current or former students of the institution, whether the institution(s) remains open or has closed.

2) To provide for the "teach-out" of students enrolled at the time of the closure of the institution(s).

3) To pay any liabilities owing to the Secretary arising from acts or omissions by the institution(s), on or before the expiration of the letter of credit, in violation of requirements set forth in the Higher Education Act of 1965, as amended ("HEA"), including the violation of any agreement entered into by the institution(s) with the Secretary regarding the administration of programs under Title IV of the HEA.

*Id.* at 1–2. The BNP Letter of Credit terms were renewed and modified multiple times between 2006 and 2017. The final amended BNP Letter of Credit, executed on April 3, 2017, reflected an amount of $102,168,215 and an expiration date of May 31, 2018. Pls' Compl. Ex. 3, at 14, 19. Between October 2006 and April 2017, each amended version of the BNP Letter of Credit was sent to DOE in accordance with the PPAs, and, in turn, EDMC's schools continued to receive federal funds. *Id.* at 1–19.

On January 5, 2015, a Credit and Guaranty Agreement ("Credit Agreement") was executed between EDMC, various lenders ("Lenders"), including ECT, and U.S. Bank (solely as Administrative Agent and Collateral Agent for the Lenders). *See generally* Pls.' Compl. Ex. 2. DOE was not a signatory to the Credit Agreement. It permitted EDMC to request or maintain letters of credit from issuing banks, including BNP Paribas, and provided that EDMC would be given loans to cover any amount withdrawn by DOE. Pls.' Compl. ¶¶ 25–26; Pls.' Compl. Ex. 2, at 22, 42–44. The arrangement created by the Credit Agreement was that once DOE submitted a draw request on a letter of credit from an issuing bank, and the bank

honored that request, EDMC was required to "reimburse [the] Issuing Bank on or before the Business Day immediately following the date on which such drawing is honored . . . in an amount . . . equal to the amount of such honored drawing." Pls.' Compl. Ex. 2, at 43. If the issuing bank was not timely reimbursed by EDMC, the Lenders were then required to make loans to EDMC, "the proceeds of which shall be applied directly . . . to reimburse [the] Issuing Bank for the amount of such honored drawing." *Id.* at 44. If the Lenders failed to reimburse fully the issuing bank, the Lenders, along with EDMC, were legally liable for the unpaid amount. *Id.*

III. The Dream Center Sale and Modification to the BNP Letter of Credit

In the mid-2010s, EDMC encountered financial difficulties, and on October 17, 2017, sold Argosy University, South University, Western State University College of Law, and 11 Art Institutes to Dream Center Education Holdings ("Dream Center"), a nonprofit organization. Pls.' Compl. ¶¶ 34–35. The actual transfer of four of the 11 Art Institutes—the Art Institute of Colorado, the Illinois Institute of Art, the Art Institute of Philadelphia, and the Art Institute of Pittsburgh—did not take place until January 19, 2018. *Id.* ¶ 35.

Dream Center was not immediately able to secure its own letter of credit for the schools purchased, as required by 34 C.F.R § 668.171. As a result, plaintiffs allege that, with the consent of the Lenders, EDMC and DOE agreed in a series of emails and letters that the existing BNP Letter of Credit, along with one other letter of credit not at issue in this case,[5] would support financial obligations associated with the schools transferred to Dream Center, as well as the schools remaining with EDMC. Pls.' Compl. ¶¶ 39–40. In an October 15, 2017 letter from Joseph Smith, Compliance Manager for DOE, to Brent Richardson, the Chief Executive Officer of Dream Center, DOE agreed to hold $92,624,329 of the letters of credit on behalf of the transferred institutions to Dream Center and $14,884,804 on behalf of the institutions remaining with EDMC. Pls.' Compl. Ex. 4, at 2. DOE, however, required both EDMC and Dream Center to "acknowledge[] that the entire amount of the LOCs on file can be used to cover any liabilities for all institutions currently covered under the [BNP Letter of Credit] regardless of

[5] In addition to the BNP Letter of Credit of $102,168,215, the transferred schools were also supported by a second letter of credit of $5,340,918 from Bank of America. Altogether, the letters of credit for the schools transferred to Dream Center totaled $107,509,133.

ownership." *Id.* at 2–3. In response, on October 17, 2017, Mark McEachen, chairman of EDMC, sent DOE a letter, providing "confirmation and acknowledgment," but clarifying that, aside from modifying the BNP Letter of Credit to also cover liabilities of the institutions transferred to Dream Center, the letter of credit otherwise remained "unmodified as to amount, maturity or otherwise until replaced/amended on or prior to May 1, 2018." Pls.' Compl. Ex. 5, at 1. In November 2017, DOE and Dream Center's institutions, executed temporary PPAs that stated:

> By agreement among DOE, [Dream Center], and EMC, DOE will continue to hold the EDMC [letters of credit] in the amount of $92,624,329 on behalf of the [Dream Center] Institutions . . . . Additionally, DOE will continue to hold $14,884,804 of the EDMC [letters of credit] on behalf of the EDMC institutions that were not conveyed to [Dream Center] . . . . Pursuant to the agreement of DOE, EDMC and [Dream Center], the entire amount of the EDMC [letters of credit] (totaling $107,509,133) can be used to cover any liabilities for any of the [Dream Center] Institutions and [Non-Dream Center] Institutions, regardless of ownership.

Pls.' Compl. Ex. 6, at 2. Under the temporary PPAs, Dream Center was required to secure a new letter of credit of its own no later than May 1, 2018, or extend the current letters of credit for its institutions until at least March 31, 2019. *Id.*

IV. DOE's Protective Draw, EDMC's Foreclosure, and the Use of the BNP Letter of Credit

Neither EDMC nor Dream Center were able to secure replacement letters of credit or extend the existing letters of credit by May 2018. As a result, on May 18, 2018, DOE made a protective draw on the BNP Letter of Credit in the full amount of $102,168,215. *Id.* DOE's draw request, submitted by an "authorized representative of the Secretary [of Education]" to BNP Paribas, certified that the funds would only be used for one or more of the three permissible uses outlined in the BNP Letter of Credit terms. *Id.* ¶ 44; Pls' Compl. Ex. 8, at 1–2. Pursuant to the EDMC Credit Agreement, the Lenders then fully reimbursed BNP Paribas for the amount drawn, thereby each obtaining a pro rata share in the repayment of the loan, including any funds returned by DOE. Out of the $14,884,804 set aside for EDMC institutions that were not sold to Dream Center, DOE returned $14,500,000

to the Lenders, and $384,804 was retained to satisfy liabilities owed by these schools, leaving $87,668,215 in DOE's control to be used as necessary. Pls.' Compl. ¶ 47.

On June 25, 2018, EDMC and the Lenders executed a foreclosure agreement, pursuant to which U.S. Bank, in its capacity as Administrative and Collateral Agent for the Lenders, foreclosed on some of EDMC's remaining assets to partially satisfy EDMC's obligations to the Lenders under the EDMC Credit Agreement. Pls.' Compl. ¶ 19. Under the foreclosure agreement, EDMC conveyed all of its interests in the "Surrendered Collateral" to the Lenders, including "EDMC's right, title, and interest in all (a) payment intangibles; (b) residual interests in any assets held by third parties as security, in trust, as collateral, or as surety; (c) commercial tort claims; and (d) all proceeds of the foregoing." *Id.* According to plaintiffs, this necessarily included "EDMC's rights to recover funds under the PPAs its schools entered into with DOE and any reversionary rights previously possessed by EDMC under, and EDMC's interests in, the BNP Letter of Credit." *Id.*

Subsequently, on June 26, 2018, EDMC filed a chapter 7 bankruptcy petition in the United States Bankruptcy Court for the District of Delaware. In those proceedings, the foreclosure agreement appropriating EDMC's remaining assets was stipulated to in reaching a court-approved settlement agreement with the Lenders. Pls.' Compl. ¶ 20. The stipulation "acknowledge[d] the validity and enforceability of the [foreclosure agreement]" and confirmed that EDMC was "obliged to turn over all Collateral (including Surrendered Collateral) or proceeds thereof to [U.S. Bank]." Def.'s Reply Ex. 1, at App. 11–12. The court ruled that the stipulation was "binding on the Parties" and "effective immediately." *Id.* at App. 2.

Dream Center soon began to experience financial difficulties as well. Between August and December 2018, DOE released $39,586,989 of the letter of credit to fund administrative and operating expenses which Dream Center had incurred while operating its schools—an action which plaintiffs allege was not in line with the permissible uses of the BNP Letter of Credit. Dream Center subsequently closed a number of Argosy University and Art Institute campuses in December 2018, and, on January 7, 2019, transferred South University and three Art Institutes to the Education Principle

Foundation ("EPF"), another nonprofit organization. *Id.* ¶¶ 49–50. In connection with the transfer to EPF, DOE permitted $28.5 million of the BNP Letter of Credit proceeds to be used to satisfy liabilities arising on or before January 7, 2019, with respect to the transferred schools. *Id.* ¶ 50. Specifically, $22 million of the $28.5 million was allocated for liabilities associated with South University campuses, and the remaining $6.5 million was allocated for liabilities associated with the three Art Institutes. *Id.* ¶ 51. Plaintiffs do not dispute that the $28.5 million allocated for those expenses, arising on or before January 7, 2019, complies with the list of permissible uses for the BNP Letter of Credit. *Id.* ¶¶ 53–54. By March 2019, aside from one Argosy University location, one Art Institute location, and the Western State University College of Law, all of Dream Center's remaining schools were closed. *Id.* ¶ 52.

V. Inspector General's Report and Subsequent Dispute

On June 29, 2021, the DOE Office of Inspector General ("OIG") published a report containing information regarding DOE's use of BNP Letter of Credit proceeds. The OIG report confirmed that when DOE was assessing whether to use letter of credit proceeds to cover the operating costs of Dream Center's closing schools:

> [Federal Student Aid] employees and [Office of General Counsel] attorneys acknowledged that the terms of Education Management Corporation's letters of credit required the proceeds to be used only to pay institutional charges owed to or on behalf of former students, to provide for the teach-out of students enrolled at the time of the schools' closures, or to pay any liabilities owed to the Federal government arising from schools' actions on or before the expiration of the letters of credit.

Pls.' Compl. Ex. 9, at 86. According to the report, despite this acknowledgement by DOE, the agency authorized $39,586,989 to fund operating expenses for 27 closing Dream Center school locations. *Id.* at 50. The report also notes that DOE had never previously used letter of credit proceeds to fund operating expenses of this kind, and "neither [DOE] nor [Federal Student Aid] had policies or procedures for such a situation." *Id.* at 46. As a result, the OIG recognized that "[DOE] provided Dream Center with

about $39.6 million more than the closing school locations normally would have received to continue teaching the students who were already enrolled." *Id.* at 50.

In July 2022, after reviewing the OIG report, ECT sent a letter to DOE, requesting a detailed accounting of DOE's use of letter of credit proceeds. In September 2022, ECT sent a follow-up letter, reminding DOE of the limited permissible uses and allocations of the letters of credit. In a December 2022 response letter to ECT, DOE denied that its use of letter of credit proceeds to fund the operating expenses of Dream Center's closing schools was improper. In a subsequent September 12, 2023 letter, Michael Frola, Division Chief of the Multi-Regional and Foreign Schools Participation Division of DOE, informed ECT that DOE still held $48,594,113.27 of the letter of credit proceeds in escrow, but claimed the charges against the BNP Letter of Credit "far exceed" that amount. Pls.' Compl. Ex. 12, at 5.

After failed attempts to negotiate with the DOE for the return of any BNP Letter of Credit proceeds not used in accordance with the BNP Letter of Credit terms, plaintiffs filed their complaint here, claiming that the alleged misuse of the letter of credit proceeds constituted a breach of contract, express or implied-in-fact, or an unlawful taking under the Fifth Amendment. In response, defendant filed this motion to dismiss under 12(b)(6) for failure to state a claim, asserting that plaintiffs cannot establish privity of contract between plaintiffs and defendant, and that plaintiffs have not alleged a valid takings claim because they hold no property interest in the letter of credit proceeds. In its reply brief, defendant raised a lack of subject matter jurisdiction defense, asserting that, because plaintiffs cannot establish privity with the government, this court must dismiss plaintiffs breach of contract claims as outside of the Tucker Act's purview.[6]

---

[6] On January 23, 2024, plaintiffs filed a motion for leave to file a sur-reply to address the government's two new arguments in its reply brief: (1) that the court lacks subject matter jurisdiction under 12(b)(1); and (2) plaintiffs do not meet the "operation of law" standard under the Anti-Assignment Act, which we discuss later in this opinion. Because the government did not raise its 12(b)(1) challenge until its reply brief, and because its second argument

## DISCUSSION

### I. 12(b)(1) and 12(b)(6) Standards of Review

When considering a motion to dismiss for lack of subject matter jurisdiction under 12(b)(1), the question "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Patton v. United States*, 64 Fed. Cl. 768, 773 (2005) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Though "the plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence and by presenting competent proof," we "must presume all undisputed factual allegations to be true and construe all reasonable inferences in favor of the plaintiff." *Pucciariello v. United States*, 116 Fed. Cl. 390, 400 (2014).

Similarly, when considering a motion to dismiss under 12(b)(6) for failure to state a claim, the complaint must "allege facts that show the plaintiff is entitled to the legal remedy sought." *Steffen v. United States*, 995 F.3d 1377, 1379 (Fed. Cir. 2021). All factual allegations made by the nonmoving party are accepted as true, and the court may draw all reasonable inferences in the nonmoving party's favor. *Fishermen's Finest, Inc. v. United States*, 59 F.4th 1269, 1274 (Fed. Cir. 2023).

Here, defendant does not dispute the factual components of plaintiffs' argument in support of a contractual basis for liability—all are based on documents. Rather, the parties disagree about the legal implications of those facts. For purposes of considering the government's motion to dismiss under both 12(b)(1) and 12(b)(6), therefore, we have an uncontested documentary record and will permit inferences in plaintiffs' favor.[7]

### II. Breach of Contract Claim

---

also pertains to the court's subject matter jurisdiction, we grant plaintiffs motion for leave to file their sur-reply.

[7] We also find it proper to consider the attached documents in the 12(b)(6) context, because they are integral to the factual allegations made in the complaint. Pls.' Compl. Exs. 1–12; Def.'s Reply Ex. 1.

The Tucker Act grants this court jurisdiction over certain claims for money damages against the United States founded upon the United States Constitution, federal statutes, executive regulations, or contracts. 28 U.S.C. § 1491(a)(1); *United States v. Mitchell*, 463 U.S. 206, 215–18 (1983). To maintain a cause of action under the Tucker Act for breach of contract, "there must be privity of contract between the plaintiff and the United States." *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998). We may also hear a contractual claim against the government if the plaintiff is a valid successor-in-interest to a party who is in privity of contract with the government, *e.g.*, *Oxy USA Inc. v. United States*, 163 Fed. Cl. 75, 88 (2023), or if a plaintiff is a subrogee of a party in privity with the government. *Nat'l Am. Ins. Co. v. United States*, 498 F.3d 1301, 1304 (Fed. Cir. 2007). Here, plaintiffs allege they are both successors-in-interest to EDMC's contractual rights under the PPAs and subrogees of EDMC.

Plaintiffs thus ultimately have a double burden. First, they must establish that there was a contractual relationship between EDMC and DOE which arguably was breached; then, they must establish they are either successors in interest or subrogees of EDMC.

a) EDMC's Contract and DOE's Breach

In order to establish jurisdiction, or state a claim for relief, plaintiffs must plead a plausible contractual relationship with the United States. If they can do so, plaintiffs must then assert a plausible breach of that contract. Defendant's argument on these issues is straightforward: it was in privity only with EDMC with respect to the PPAs—not the BNP Letter of Credit. Thus, even if plaintiffs succeeded to the interests of EDMC, plaintiffs still lack privity and cannot sue with respect to the letter of credit; in other words, the government cannot be sued for breach of terms to which it is not a party. The contract claim therefore must be dismissed either for lack of jurisdiction or for failure to state a claim, per defendant.

i. Contract Formation

The lynchpin of plaintiffs' theory is that DOE agreed to be bound by the terms (the listed permissible uses for the funds) in the BNP Letter of Credit, whether that be expressly by incorporation of the letter of credit into

the PPAs or by implication from the whole of the parties' dealings. In reply, defendant avers that "the Letter of Credit was issued by BNP Paribas bank to EDMC" and that "nothing in the PPAs 'explicitly incorporated' the BNP Letter of Credit." Def.'s Reply, at 5, 8. We address each point below.

The elements of contract formation for both express and implied-in-fact contracts with the government are identical. *Threshold Techs., Inc. v. United States*, 117 Fed. Cl. 681, 696 (2014). A party alleging either must show "a mutual intent to contract including an offer, and acceptance, and consideration," and "that the Government representative who entered or ratified the agreement had actual authority to bind the United States." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). At least for purposes of this motion, defendant has not questioned the authority of any government actors to bind the agency.

In determining whether there is mutual intent to contract, we look at the surrounding circumstances, including "direct representations between the parties, oral or written, that convey promissory intent." *Mine Detection & Dog Ctr. v. United States*, 170 Fed. Cl. 378, 386 (2024); *see also Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1346 (Fed. Cir. 2001). A contract "may arise as a result of the confluence of multiple documents" so long as there remains "a clear indication of intent to contract and the other requirements for concluding that a contract was formed" are met. *D & N Bank v. United States*, 331 F.3d 1374, 1378 (Fed. Cir. 2003). For example, in *Cal. Fed. Bank, FSB*, in various mergers involving the plaintiff bank, the bank entered into an acquisition agreement with the government, allowing the plaintiff to amortize the resulting goodwill. *Id.* at 1345. The government sent two subsequent forbearance letters to the plaintiff, confirming the plaintiff's ability to amortize the goodwill over 40 years. *Id.* Later, legislation was adopted forcing the amortization of goodwill over a reduced period. *Id.* at 1345–46. Though the government argued that no contract existed regarding amortization because there was no assistance agreement explicitly incorporating the forbearance letters into the overall agreement, the court recognized that it need not "rely exclusively on the assistance agreements to find a contract" and that it could consider "contemporaneous documents and surrounding circumstances that included forbearance letters like those present here." *Id.* at 1346. In determining that the 40-year amortization period was part of an express contractual obligation, the Federal Circuit

considered the forbearance letters, as well as "documents such as correspondence, memoranda, and . . . resolutions." *Id.* at 1347–48. It also considered the circumstances surrounding the parties' negotiations. *Id.* at 1347; *see also Winstar Corp. v. United States*, 64 F.3d 1531, 1542 (Fed. Cir. 1995) ("If the parties did not intend to use supervisory goodwill for regulatory capital purposes there would simply be no reason for the extensive negotiations and the conditions regarding its use."), *aff'd and remanded*, 518 U.S. 839, 865–86 (1996) ("[W]e do not doubt the soundness of the Federal Circuit's finding that the overall 'documentation in the . . . transaction establishes an express agreement.'").

Here, to establish a plausible express contract theory, plaintiffs will need to show, through the documentation and surrounding circumstances, that at the time of contract formation, EDMC and DOE mutually intended to enter into an express agreement encompassing both the PPAs and BNP Letter of Credit terms.[8] Plaintiffs first point to the relevant documents to support their contract claim. Beginning with the PPAs, executed between EDMC's educational institutions and DOE, each institution was required annually to "post surety in the form of an irrevocable letter of credit" to receive federal student aid funds. Pls.' Compl. at ¶ 24. Upon EDMC's request, BNP Parabis sent the BNP Letter of Credit, using a DOE-prescribed format, to DOE for approval. The BNP Letter of Credit restricted DOE's ability to use letter of credit proceeds to certain uses. Plaintiffs argue that, in response to execution of the Letter of Credit, DOE allowed EDMC's, and later Dream Center's, institutions to receive hundreds of millions in federal student aid funds for over a decade. When DOE made its protective draw of the BNP Letter of Credit, it was exercising its rights under the PPAs and expressly certified, in writing, that the withdrawn funds would be used for "Permitted Uses" identical to the permissible uses outlined in the BNP Letter of Credit terms. Pls.' Compl. ¶ 33; Pls.' Compl. Ex. 8, at 1–2.

Plaintiffs argue that the letter of credit was an integral part of the agreement between the EDMC institutions and DOE. It is, in fact, required by the PPA, and its precise format was also to be supplied by DOE, per the PPA. Although it is unknown at this stage who supplied the specific terms of

[8] At this stage, we recognize that the timeline connecting the BNP Letter of Credit terms with the PPAs is unclear from the filings.

the letter of credit, and more importantly, the limitations on use, a plausible read of the circumstances is that DOE knew that the letter of credit would contain these limitations on its use of any funds drawn on the letter of credit and that it intended to be bound by those terms.

DOE's draw certification further supports the inference that "[DOE] at all times understood that its ability to draw down on the BNP Letter of Credit was governed by the terms and conditions set forth in the BNP Letter of Credit." Pls.' Compl. ¶ 67. Similarly, the amendments to the BNP Letter of Credit support this conclusion. Each time the amended BNP Letter of Credit terms were sent to DOE, the terms consistently clarified that "all other terms and conditions remain unchanged." Pls.' Compl. Ex. 3, at 1–2, 4–7, 9–10, 12–15, 17–19. Additionally, the modification to include educational institutions transferred to Dream Center was finalized after email and letter correspondence between EDMC and DOE in which EDMC clarified that the BNP Letter of Credit remained "unmodified as to amount, maturity or otherwise until replaced/amended on or prior to May 1, 2018." Pls.' Compl. Ex. 5, at 1. These communications regarding the BNP Letter of Credit terms and their subsequent amendments once again supports the inference that DOE was aware it was bound by the terms of the BNP Letter of Credit.

These alleged facts reasonably permit, at the pleading stage, an inference of an offer, acceptance, and consideration, where "[DOE] and [EDMC] had a mutual understanding that the terms of the PPAs are supplemented by the terms set forth in, among other things, the content of the BNP Letter of Credit." Pls.' Compl. ¶ 66. EDMC promised to secure financial security through a letter of credit for those institutions deemed not financially responsible. DOE, in exchange, promised to make student aid funds available to EDMC's institutions and, according to plaintiffs, to abide by the terms of the letter of credit if it exercised its rights under that letter of credit.

While plaintiffs have been coy about identifying the precise catalytic moment of contract formation, they have stated a plausible scenario in which EDMC and DOE mutually agreed that the BNP Letter of Credit terms were part of a single express obligation along with the PPAs. Alternatively, the facts and circumstances alleged support a plausible scenario that DOE manifested its intent to be bound by the terms of the letter as an implied-in-

fact agreement. Under either reading of the facts, plaintiffs' complaint survives a motion to dismiss on the privity issue, assuming they can also plausibly show that they inherited EDMC's contractual rights.

ii. Contract Breach

Having found plaintiffs' express contract argument plausible, we also find support for plaintiffs' contractual breach claim. The BNP Letter of Credit terms outline specific limitations for use of the letter of credit proceeds: (1) to pay refunds charged to students; (2) fund "teach out" expenses; and (3) to pay liabilities owed to DOE. Pls.' Compl. Ex. 3, at 1–2. Secondary support is also found in the OIG report, in which the agency acknowledged that the letter of credit proceeds could only be used for the permissible purposes outlined in the BNP Letter of Credit and that the agency's use of the withdrawn funds was unprecedented and not covered by regulation.

Drawing all reasonable inferences in plaintiffs' favor, plaintiffs reasonably claim that, at the very least, DOE's use of $39,586,989 of the letter of credit proceeds to fund Dream Center's administrative and operating expenses does not comply with the BNP Letter of Credit's list of permissible uses. Thus, plaintiffs plausibly claim EDMC is entitled to recover funds not used in accordance with the BNP Letter of Credit under an express or implied contract theory.

b) Transfer of EDMC's Contractual Interest to Plaintiffs

We now turn to whether plaintiffs plausibly allege that they can enforce EDMC's contractual interest through either successorship or subrogation.

i. Successorship

Under the Anti-Assignment Act, "[t]he party to whom the [f]ederal [g]overnment gives a contract or order may not transfer the contract or order, or any interest in the contract or order, to another party." 41 U.S.C. § 6305; *see also Fireman's Fund Ins. Co. v. England*, 313 F.3d 1344, 1349 (Fed. Cir. 2002) (stating the Anti-Assignment Act "broadly prohibit[s] . . . transfers of

contracts involving the United States or interests therein, and assignment of claims against the United States."). This court has, however, recognized two exceptions to this general rule: (1) where the government has voluntarily waived the Anti-Assignment Act for a specific assignment; and (2) where an assignment is exempt from the Anti-Assignment Act "by operation of law." *DDS Holdings, Inc. v. United States*, 158 Fed. Cl. 431, 437 (2022). Because there is no indication the government has waived the Anti-Assignment Act in this case, we focus on whether the transfer is exempt by operation of law.

"In enacting anti-assignment legislation, Congress was interested in keeping the government from having to deal with multiple claimants." *Westinghouse Elec. Co. v. United States*, 56 Fed. Cl. 564, 570 (2003), *aff'd sub nom. Westinghouse Elec. Co., LLC v. United States*, 97 F. App'x 931 (Fed. Cir. 2004). The Anti-Assignment Act "enable[s] the United States to deal exclusively with the original claimant," thereby "eliminat[ing] the 'confusion of conflicting demands for payment and the chances of multiple liability.'" *Johnson Controls World Servs., Inc. v. United States*, 44 Fed. Cl. 334, 343 (1999) (quoting *Tuftco Corp. v. United States*, 614 F.2d 740, 744 (Ct. Cl. 1980)). In light of that purpose, courts have recognized that "the Act does not restrict assignments where there is no probability that the United States could suffer injury"—namely, liability to multiple claimants. *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 84 Fed. Cl. 768, 778 (2008). Permissible assignments include those "by operation of law," in which the assignment is pursuant to a "corporate merger, consolidation, or reorganization." *DDS Holdings, Inc.*, 158 Fed. Cl. at 437. As the Supreme Court noted:

> We cannot believe that Congress intended to discourage, hinder or obstruct the orderly merger or consolidation of corporations as the various states might authorize for the public interest. There is no probability that the United States could suffer injury in respect of outstanding claims from such union of interests and certainly the result would not be more deleterious than would follow their passing to heirs, devisees, assignees in bankruptcy, or receivers, all of which changes of ownership have been declared without the ambit of the statute.

*Seaboard Air Line Ry. v. United States*, 256 U.S. 655, 657 (1921).

In other words, "[t]here is a distinction between a voluntary transfer of contract rights . . . and one in which the transfer is forced by law, like corporate succession through purchase or merger, or by the operation of law, such as bankruptcy." *Am. Gov't Properties v. United States*, 118 Fed. Cl. 61, 67 (2014). "The obvious reason [for] this is that there can be no purpose in such cases to harass the government by multiplying the number of persons with whom it has to deal." *Goodman v. Niblack*, 102 U.S. 556, 560 (1880). However, even if the assignment is voluntary, the assignment may still be exempt from the Act if it was made to satisfy a debt owed to creditors. *United States v. Shannon*, 342 U.S. 288, 292 (1952) (recognizing that "general assignments for the benefit of creditors" is an "exception[] to the broad sweep of the statute"). This is because "the exception for voluntary assignments for the benefit of creditors has been justified by analogy to assignments in bankruptcy." *Id.* The Supreme Court in *Goodman* expounded on this narrow exception when addressing the Act to Prevent Frauds to the Treasury of the United States, a predecessor to the Anti-Assignment Act, stating:

> In what respect does the voluntary assignment for the benefit of his creditors, which is made by an insolvent debtor *of all his effects*, which must, if it be honest, include a claim against the government, differ from the assignment which is made in bankruptcy? There can here be no intent to bring improper means to bear in establishing the claim, and it is not perceived how the government can be embarrassed by such an assignment. The claim is not specifically mentioned, and is obviously included only for the just and proper purpose of appropriating the whole of his effects to the payment of all his debts. We cannot believe that such a meritorious act as this comes within the evil which Congress sought to suppress by the act of 1853.

*Goodman*, 102 U.S. at 560–61.

Picking up on *Goodman*, this court has further emphasized that, for this exception to apply, the debtor must transfer "*all his effects*." *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 144 (2002). Thus, if pursuant to insolvency, an entity fully forecloses its assets to satisfy a debt owed to a

creditor, and that foreclosure necessarily includes a voluntary assignment of its contractual claims against the government, that voluntary assignment is akin to assignments in bankruptcy and is exempt from the restrictions of the Anti-Assignment Act. *Goodman*, 102 U.S. at 560–61.

Here, plaintiffs assert that, because EDMC's contractual interest was transferred to plaintiffs through a foreclosure agreement that was subsequently confirmed in a bankruptcy proceeding, the transfer is "by operation of law," and is therefore exempt from the Anti-Assignment Act. We believe this is a viable assertion under the facts alleged.

EDMC became an insolvent debtor when it faced financial difficulties, forcing it to sell many of its schools. To satisfy EDMC's obligations to plaintiffs under the EDMC Credit Agreement, EDMC surrendered "certain" assets to plaintiffs, as creditors, under the foreclosure agreement, including general intangibles. Pls.' Compl. ¶ 19, 43. Almost immediately thereafter, EDMC "commenced a proceeding pursuant to chapter 7 of the United States Bankruptcy Code, to liquidate its *remaining* assets" to plaintiffs. *Id.* ¶ 43 (emphasis added). The Bankruptcy Court approved a settlement, whereby the parties "acknowledge[d] the validity and enforceability of the [foreclosure agreement]." Def.'s Reply Ex. 1, at App. 12. As a result, EDMC was "obliged to turn over all Collateral (including Surrendered Collateral) to [U.S. Bank]." Def.'s Reply Ex. 1 at Appx 11. Taking plaintiffs' undisputed factual statements as true, the Partial Strict Foreclosure Agreement and the bankruptcy settlement together transferred all of EDMC's effects to plaintiffs to satisfy EDMC's debt, making it arguably exempt from the Anti-Assignment Act. This application of the "operation by law" exception comports with its purpose, as there is little reason to believe the government would be subject to multiple claimants in this scenario. All of EDMC's contractual rights were fully transferred to plaintiffs pursuant to its complete insolvency, and there is no reason to believe EDMC can still pursue contractual claims against DOE. As a result, though plaintiffs do not share privity of contract with the government,

plaintiffs reasonably argue that EDMC's contractual rights were validly assigned to plaintiffs as successors.[9]

III. Fifth Amendment Takings Claim

Lastly, we address plaintiffs' Fifth Amendment takings claim. Usually, "[w]hen a plaintiff possesses enforceable rights under a contract with the government, 'interference with such contractual rights generally gives rise to a breach claim not a taking[s] claim.'" *Century Expl. New Orleans, Inc. v. United States*, 103 Fed. Cl. 70, 77 (2012) (quoting *Sun Oil Co. v. United States*, 572 F.2d 786, 818 (Ct. Cl. 1978)). Though, in limited circumstances, a contractual claim may also constitute a takings claim, those limited circumstances do not apply where the plaintiff has failed to demonstrate a property interest other than their alleged rights in contract. *Id.* 77–78. While this circuit has long recognized that "one cannot possess a cognizable property interest in money generally, one's property interest in a *specific* fund of money . . . is cognizable under the Takings Clause." *Elec. Welfare Tr. Fund v. United States*, 166 Fed. Cl. 709, 717 (2003) *reconsideration denied*, 167 Fed. Cl. 174 (2023) (emphasis added); *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1340 (Fed. Cir. 2001). This is because the plaintiff's cognizable property interest is in the fund itself versus an abstract sum of money. *Elec. Welfare Tr. Fund*, 166 Fed. Cl. at 717; *Adams v. United States*, 391 F.3d 1212, 1225 (Fed. Cir. 2004). As a result, a takings violation of one's property interest in a specific sum of money is only implicated where the government has appropriated the fund *in toto*. *Elec. Welfare Tr. Fund*, 166 Fed. Cl. at 717. Necessarily, "[f]inding a property interest in a specific fund . . . when only a portion of the fund was appropriated would require recognizing a property interest in money alone, which no court may do." *Id.*

Though DOE initially drew the entire amount of the BNP Letter of Credit, totaling $102,168,215, plaintiffs only seek compensation for "an amount of approximately $92 million"—a portion of the entire letter of credit

---

[9] It is therefore unnecessary to evaluate plaintiffs' alternative argument based on subrogation; although, we note there does not appear to be the required three-party relationship between the government, EDMC, and plaintiffs.

proceeds. Pls.' Compl. ¶ 86. Additionally, according to plaintiffs' complaint, DOE returned $14,500,000 of the letter of credit proceeds to plaintiffs, and plaintiffs concede that, at least up to $28.5 million of the letter of credit proceeds used to pay for liabilities arising on or before January 7, 2019 were "permitted" and within the category of "Permissible Uses." *Id.* ¶¶ 53–54. Thus, because plaintiffs only seek compensation for a portion of the entire letter of credit proceeds, the amount sought by plaintiffs does not constitute a specific and particular pot of money in its entirety, but rather an abstract sum. Because we cannot recognize a property interest in money alone, plaintiffs Takings Clause claim is dismissed under 12(b)(6).

CONCLUSION

In sum, plaintiffs plausibly allege that the PPAs and BNP Letter of Credit terms together formed an express contract between EDMC and DOE, and because plaintiffs arguably are successors in interest to EDMC's contractual rights through a valid assignment, plaintiffs assert a plausible contractual breach claim. Because plaintiffs plausibly claim their contractual rights, and because plaintiffs cannot hold a property interest in money alone, plaintiffs cannot maintain their takings claim. Accordingly, the government's motion to dismiss under 12(b)(1) and 12(b)(6) is denied regarding plaintiffs' contractual breach claim and granted regarding plaintiffs' takings claim. Defendant is directed to answer the complaint on or before March 28, 2025.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge