# In the United States Court of Federal Claims

No. 24-775
(Originally filed: July 28, 2026)
(Re-issued: August 28, 2026)[1]

* * * * * * * * * * * * * * * * * * * * * *

EDUCATION CREDITOR TRUST and
U.S. BANK TRUST COMPANY,

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant*.

* * * * * * * * * * * * * * * * * * * * * * *

*James A. Newton* and *Andrew Kissner*, New York, NY, for plaintiff Education Creditor Trust.

*Antonia R. Soares*, Senior Trial Counsel, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Brett A. Shumate*, Assistant Attorney General, *Patricia M. McCarthy*, Director, *Steven J. Gillingham*, Assistant Director, for defendant. *Jacob Lallo*, Department of Education, of counsel.

OPINION

BRUGGINK, *Senior Judge*.

---

[1] This opinion was originally issued under seal to afford the parties an opportunity to propose any redactions of protected information. The parties have conferred and represent that no redactions are necessary. The opinion thus appears in full.

Pending is plaintiff Education Creditor Trust's ("ECT") motion to quash a deposition subpoena served by defendant on ECT's counsel of record, James A. Newton. The matter is fully briefed, and oral argument was heard on July 23, 2026. For the reasons set out below, the motion is granted.

BACKGROUND[2]

Plaintiff ECT is a Delaware trust, formed in 2020, which holds loans previously belonging to a group of lenders (the "Lenders"). The loans originally belonging to those lenders were for Education Management Corporation ("EDMC"), which used them to fund the for-profit colleges it operated. Among ECT's predecessor lenders was Candlewood Investment Group, LP, whose principal, Michael Lau, is now the manager of CommercialWRF LLP, which serves as trustee of ECT. ECT describes Candlewood and the other lenders as its predecessors in interest. Co-plaintiff U.S. Bank Trust Company, N.A. sues solely as agent for the Lenders. The defendant is the United States, acting through the Department of Education ("DOE").

EDMC's schools received federal student aid under Title IV, which required EDMC to demonstrate financial responsibility or, failing that, to post an irrevocable letter of credit payable to DOE. The letter, issued by BNP Paribas and last amended in 2017, permitted DOE a protective draw under certain conditions and specified three permissible uses for the proceeds: student refunds, teach-outs, and liabilities owing to the Secretary of DOE arising from institutional acts or omissions on or before the letter's expiration.

Under a 2015 Credit Agreement, to which DOE was not a party, the Lenders backstopped the letter of credit. The arrangement worked in a sequence: if DOE drew, BNP Paribas as the issuing bank would pay DOE, EDMC would then owe BNP reimbursement, and if EDMC failed to reimburse BNP, the Lenders were obligated to fund that reimbursement themselves, each acquiring a pro rata participation in the drawing. This situation played out thereafter. EDMC sold most of its schools to Dream Center Education Holdings ("DCEH") in 2017. When DOE drew down the full amount of the letter of credit in May 2018 after the schools ultimately failed, EDMC did not reimburse BNP. Instead, BNP was reimbursed by the Lenders. Through that funding obligation, the plaintiffs trace their asserted interest in the proceeds. Dream Center then failed as well. ECT, as the Lenders' successor, now sues

[2] The facts are drawn from the complaint, the motion briefs, and our prior opinion, and are uncontested, unless indicated.

the government for roughly $92 million on theories of express and implied-in-fact contract, alleging that DOE spent roughly $39.6 million of the proceeds outside the three permitted purposes and past the deadlines the letter allowed. Defendant that maintains the expenditures were permissible and that no time limits were agreed upon.

The government moved to dismiss the complaint on August 30, 2024, arguing that no contract existed between it and plaintiffs, and, in the alternative, even if a contract did exist, the court lacked jurisdiction because plaintiffs were not in privity with the United States. Plaintiffs' contention is that EDMC's rights against DOE in fact passed to ECT, which we held plausible at the pleading stage but did not decide.[3] 175 Fed. Cl. 212, 224-25 (2025). We dismissed, however, a separate takings claim. *Id.* at 225-26.

ECT did not exist when any of the events in suit occurred. It was not a party to the Credit Agreement, was not a Lender when DOE drew, and was not formed until 2020, after EDMC and the Lenders executed the 2018 foreclosure agreement through which ECT traces its rights. The consequence for present purposes is that the individuals with firsthand knowledge of the 2018–19 negotiations are the Lenders and their representatives, not ECT.

During discovery, the government served a deposition subpoena on James A. Newton, a Morrison & Foerster partner who is ECT's counsel of record. In March 2018, before DOE's draw, the Lenders, including Candlewood, retained Mr. Newton and his firm. Mr. Newton participated in the 2018–19 negotiations with DOE that gave rise to the claims. ECT has moved to quash. The government wants Mr. Newton's testimony about what the Lenders sought in those negotiations. ECT responds that everything Mr. Newton knows he learned as lawyer for his clients, making it highly likely that the information would be protected by the attorney-client privilege, and that the government could have obtained the same facts from the Lenders themselves or from DOE's own witnesses. Whether Mr. Newton may be deposed is the only question before us.

There is no question that Mr. Newton participated in the 2018–2019 negotiations with DOE over the sale of the Dream Center schools and the use of the Letter of Credit proceeds. On January 2, 2019, he sent a letter to DOE's

[3] The government continues to contest, now on a more developed record, whether ECT has privity and standing to press claims arising from events in 2018 and 2019.

Diane Auer Jones, confirming DOE's "agreement to release $14,500,000 of proceeds from EDMC's draw under a letter of credit," and reciting that DOE's agreement rested "on the representations of Candlewood Investment Group LP, the investment manager of certain Lenders, that a controlling number of Lenders have agreed" that the delivery was permitted. Reply Ex. 2 at 18. The government's sealed appendix contains sixteen email chains on which his name appears in some capacity. Reply at 7. On roughly half, he is a passive recipient, the messages being sent by Mr. Lau, Ms. Jones, Candlewood's regulatory counsel, and others. On the rest, he writes principally to negotiate and document the $14.5 million release with DOE counsel Donna Mangold.

The government's June 2025 initial disclosures identified Mr. Newton as "involved in the potential sale of the DCEH schools and in negotiations with [DOE] for the agency's release of $14.5 million of the [Letter of Credit] proceeds." Resp. at 7 (quoting Def.'s App. 1) (ECF No. 66). It also identified DOE personnel, including Ms. Mangold. *Id.* ECT's initial disclosures identified one Lender-side participant in the transactions, Mr. Lau, whom ECT explains it disclosed because he is the Lender witness it intends to rely on, having separately given the government contact information for additional Lenders. Resp. at 7 (citing Def.'s App. 2) (ECF no. 66); Reply at 6 n.6.

The parties dispute how we ought to characterize Newton's participation in the events. The government calls Mr. Newton "an actor who participated in the transactions and [he was] a witness to the actions of the lenders," Resp. at 1, and "a public-facing negotiator with personal knowledge of the transactions," *id.* at 16, possessing "independent knowledge of the facts underlying" them, *id.* at 23. ECT describes the same conduct as "an attorney's quintessential functions, drafting legal documents and negotiating with other attorneys on behalf of clients," Reply at 3, and maintains that whatever Mr. Newton knows of his clients' "goals, motivations, and expectations . . . could come from nowhere but the information provided to him in the course of the attorney-client relationship," *id.* at 2. The government responds that Mr. Newton "is not a litigator" and that its substantive communications in this case "have been limited to Andrew Kissner." Resp. at 33. ECT points out that Mr. Newton is counsel of record, has led the engagement since ECT's inception, and "provides invaluable service in preparing for depositions, drafting briefs, and litigation strategy." Reply at 13.

ECT deposed four current and former DOE witnesses: (1) Tara Sikora (March 25, 2026); (2) Diane Auer Jones (April 23, 2026); (3) Michael Frola (May 6, 2026); and (4) Jeremy Early (May 27, 2026), DOE's RCFC 30(b)(6) designee. Mot. to Quash ("MTQ") at 5–7. The government questioned Diane

Auer Jones and Michael Frola, but not the others. *Id.* The government deposed Mr. Lau for seven hours on May 28, 2026. MTQ at 7. An RCFC 30(b)(6) deposition of ECT has been noticed and remains to be scheduled. *Id.* The government has stated that it will submit an affidavit from Ms. Mangold at summary judgment. *Id.* at 8. ECT represents that the government has had a loan register identifying every lender since no later than September 26, 2025, and that it has deposed no lender witnesses other than Mr. Lau. Reply at 5.

The government served the deposition subpoena on Mr. Newton on May 14, 2026, for a date "to be determined." MTQ at 3 (citing Ex. 1). ECT's counsel emailed on May 21, asking the government to advise as to "(1) the nature of the information you seek from Mr. Newton; (2) the relevance of such information to the Government's case; and (3) why you believe such information cannot be obtained from another source." *Id.* at 3 (quoting Ex. 2). ECT demanded withdrawal by letter on May 28. *Id.* at 3 (citing Ex. 3). The government declined to withdraw the motion on June 3 in a five-page letter, which identified four subject areas for deposition: (1) the 2018 and 2019 transactions to sell the EDMC and Dream Center institutions; (2) whether Candlewood "favored" the use of Letter of Credit proceeds to rescue the Dream Center schools; (3) Candlewood's 2019 request that DOE release $14.5 million of proceeds to the Collateral Agent; (4) the creation of ECT as a trust. *Id.* at 5 (quoting Ex. 4 at 1).

## DISCUSSION

Subpoenas in this court are governed by Rule 45 of the Rules of the United States Court of Federal Claims ("RCFC"). On a timely motion, this court must quash or modify a subpoena that "subjects a person to an undue burden." RCFC 45(d)(3)(A)(iv). Ordinarily, the movant bears the burden of showing that a subpoena is unduly burdensome and that "burden is particularly heavy to support a motion to quash as contrasted to some more limited protection." *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1210 (Fed. Cir. 1987); *see Jz Buckingham Invs. LLC v. United States*, 78 Fed. Cl. 15, 23 (2007); *Jade Trading, LLC v. United States*, 65 Fed Cl. 188 (2005).

A subpoena and deposition of opposing counsel, however, significantly shifts that burden as it is "strongly disfavored." *Alcon Labs., Inc. v. Pharmacia Corp.*, 225 F. Supp. 2d 340, 342 (S.D.N.Y. 2002). The party seeking the deposition, not the party resisting it, must justify it. *Id.* We find the analysis articulated in *Shelton v. Am. Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986), to be appropriate. We cited *Shelton* in *Sparton Corp. v. United States*, 44 Fed. Cl. 557, 563 (1999), and have applied it since, *see, e.g., McCarty v. United States*,

131 Fed. Cl. 643, 648 (2017); *Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 98 Fed. Cl. 647 (2011).

Under *Shelton*, deposing an opposing party's counsel is not categorically barred, but the party seeking the deposition must establish that "(1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and non-privileged; and (3) the information is crucial to the preparation of the case." *Sparton*, 44 Fed. Cl. at 563 (quoting *Shelton*, 805 F.2d at 1327). The three requirements are conjunctive. The burden of establishing all three rests on the party seeking the deposition.

The government disagrees, urging that *Shelton* does not govern, reading it as aimed only at protecting an attorney's litigation strategy. Defendant argues that this court, in *Sparton*, applied the test only because the parties there "concede[d] that [the attorney] does not have independent or firsthand knowledge of the facts." Resp. at 22–23 (citing *Sparton*, 44 Fed. Cl. at 562). Although not bound by these cases, we are persuaded that *Shelton* provides the best template. *Sparton* adopted the three-part test as the standard for deposing opposing counsel in this court, and *McCarty* reaffirmed that "the circumstances in which the depositions of opposing counsel are permitted are few and far between." *McCarty*, 131 Fed. Cl. at 648. Neither confined the test to cases in which the attorney disclaims all factual knowledge. Nor does *Gulf Group*, on which the government also relies, displace *Shelton*. *Gulf Group* applied the *Shelton* test to an attorney who, outside her role as legal counsel, served as a fact finder for a contracting officer. *Gulf Grp.*, 98 Fed. Cl. at 653. Because she had acted, in part, outside the role of litigation counsel, the case bears on how the prongs apply to an attorney said to be a fact witness, not on whether the test applies at all. We therefore consider the government's fact-witness argument where it belongs, in the analysis of the individual prongs, to which we turn.

We begin with the question of whether the party seeking the deposition made an "adequate effort" to obtain the information from alternative sources, including non-attorney fact witnesses, document requests, and interrogatories. *Sparton*, 44 Fed. Cl. At 563. The "failure to show that other avenues of discovery have been exhausted necessarily detracts from [the] argument that the information sought is not available elsewhere." *Id.* The showing is not satisfied merely because deposing counsel would be convenient; the question is whether other reasonably practical means exist. Because this prong is often dispositive, a subpoena has been quashed on this ground alone, even where

the information is otherwise relevant, non-privileged, and crucial. *See Simmons Foods, Inc. v. Willis*, 191 F.R.D. 625, 631 (D. Kan. 2000).

The prong is met, by contrast, where counsel is not a conduit for facts available elsewhere but a central participant in the events underlying the claim, such that the facts sought reside uniquely with the attorney. Such was the situation in *King-Fisher Co. v. United States*, 58 Fed. Cl. 570 (2003), where the attorney had personally performed the calculation the opposing party sought to probe. The line the cases draw is between an attorney who happens to know facts that others know and an attorney who *alone* knows facts because he alone performed the act in question. *See King-Fisher*, 58 Fed. Cl. at 571–572; *cf. Sparton*, 44 Fed. Cl. at 563.

Here, plaintiff has shown that the government has not made an effort to exhaust alternative methods, through deposing other lenders or by relying on its own witnesses. The government's contentions, that no one but Mr. Newton will be able to testify as to what the Lenders were expecting with respect to use of the Letter of Credit proceeds and that they understood DOE to face no time limitation in using the proceeds, are unavailing. Although Mr. Newton then represented Candlewood, and now represents their successor, ECT, other witnesses to the events as they unfolded undoubtedly exist. The best source of that information is the lenders themselves. ECT represents, in fact, that the government has possessed a loan register identifying every Lender under the Credit Agreement no later than September 26, 2025, and it has separately supplied contact information for additional lender witnessees. Reply at 5–6 & n.6. Defendant, however, has deposed only a single lender witness, Mr. Lau.

The government's answer is that Candlewood's lawyer, Mr. Newton, is in the best position because the other lenders did not sue the government. Defendant deposed Candlewood's principal for seven hours. That the government found those answers unsatisfying, does not convert Mr. Newton into an exclusive source. The first prong turns on necessity rather than preference. Defendant has not identified in what ways Mr. Lau's testimony was inadequate.

Unlike *King-Fisher*, where the attorney had personally performed the calculation the opposing party sought to probe, what the Lenders favored is not a fact Mr. Newton created by an act of his own. It is a fact the lenders possess and presumably is primarily reflected in the documents generated by the participants. The government's own exhibits make the point. The communications it says warrant Mr. Newton's deposition are, in substantial part, multiparty exchanges among Mr. Lau, Ms. Jones, Ms. Mangold, Mr.

Goldstein, and others, on many of which Mr. Newton is merely a recipient. A document circulated to a half-dozen participants does not establish that the one attorney copied on it is the only person who can describe the relevant events. Defendant has not sufficiently explained why it did not seek out the other lenders. Because the information remains available from sources the government has not exhausted, it has not carried its burden on the first prong, and the subpoena may be quashed on that basis alone. *See Simmons Foods, Inc. v. Willis*, 191 F.R.D. 625, 631 (D. Kan. 2000). In short, defendant has not exhausted the ordinary avenues of discovery.

The second prong asks whether the information is relevant and nonprivileged. We need not decide whether this is the case because the government's failure to exhaust alternative sources independently requires that we quash the subpoena. The third prong requires that the information be crucial, and not merely relevant, useful, or helpful, to the preparation of the moving party's case. Similar to the second prong, we need not decide whether Mr. Newton's testimony is crucial. We observe only that, even if the information were unavailable elsewhere, the government would still have to show that it is crucial, and much of what it seeks would have trouble meeting this description. Its contention is that "Mr. Lau did not provide meaningful responses," Resp. at 28 (citing Lau Tr. 298:5-308-19), but it does not identify what it could not access through Mr. Lau or why its dissatisfaction is due to his ignorance as opposed to the questions he was asked. *Gulf Group* found counsel's testimony crucial only after specifically identifying the other witnesses' accounts as inadequate because the other witnesses had relied entirely on the counsel being deposed for that information, making her testimony central. 98 Fed. Cl. at 651. Defendant makes no comparable showing here, resting instead on a conclusory characterization of Mr. Lau's testimony as insufficient.

## CONCLUSION

Defendant has not met its burden to show that it has no other means to access the information it seeks, which is sufficient to quash the subpoena of Mr. Newton, and we hereby do so. Accordingly, plaintiff's motion to quash is granted.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge